IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID M. EVANS, an individual; RON PICKENS, an individual, d/b/a P & D CONSTRUCTION, an Idaho sole proprietorship; SAGE BUILDERS, an Idaho limited liability partnership;<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>SHOSHONE-BANNOCK LAND USE POLICY COMMISSION; NATHAN SMALL, as Chairman of the Fort Hall Business Council; GLENN FISHER, as a member of the Fort Hall Business Council; LEE JUAN TYLER, as a member of the Fort Hall Business Council; DEVON BOYER, as a member of the Fort Hall Business Council; TINO BATT, as a member of the Fort Hall Business Council; BLAINE J. EDMO, as a member of the Fort Hall Business Council; DARRELL DIXEY, as a member of the Fort Hall Business Council; TONY GALLOWAY, SR., as Chairman of The Shoshone-Bannock Land Use Policy Commission; CASPER APPENAY, as a member of the Shoshone-Bannock Land Use Policy Commission; JOHN FRED, as a member of the Shoshone-Bannock Land Use Policy Commission; ARNOLD APPENEY, as the Executive Director of the Shoshone-Bannock Land Use Department; and GEORGE GUARDIPEE, as a enforcement official of the Shoshone-Bannock Land Use Policy Commission; SHOSHONE-BANNOCK TRIBAL COURT JUDGES JOHN DOES, as a Tribal Judicial officer(s) | Case No.  4:12-CV-417-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

|        Defendants. |   |
|---|---|

## INTRODUCTION

The Court has before it two motions to dismiss filed by the defendants (collectively referred to as the Shoshone-Bannock Land Use Policy Commission (LUPC)), and a motion for preliminary injunction filed by plaintiffs. The Court heard oral argument on the motions on December 10, 2012, and allowed plaintiffs additional time to respond to LUPC's submissions. That response was received on December 17, 2012. After examining all the submissions by both sides, the Court has decided, for the reasons set forth below, to grant the motions to dismiss and deny the motion for preliminary injunction.

## FACTUAL BACKGROUND

The Shoshone-Bannock Tribes reside on the Fort Hall Indian Reservation that encompasses about 870 square miles. Plaintiff David M. Evans, not a member of the Tribes, owns land in fee simple within the boundaries of the Fort Hall Reservation. Evans constructed a single family residence on his property during 2012, and obtained a building permit from Power County authorizing the construction. Evans did not apply for or obtain a Tribal building permit.

In June of 2012, the LUPC filed suit against Evans and the builders of his home in the Tribal Court. LUPC alleged that Evans and the builders had violated the Tribal zoning laws by failing to obtain a Tribal building permit for the home. Evans and the

**Memorandum Decision & Order - 2**

builders responded by filing this action against the LUPC and various individual Tribal members of the LUPC and the Fort Hall Business Council. The Tribal Court stayed its action pending resolution by this Court of the motions at issue here.

      LUPC has filed in this Court a motion to dismiss, claiming that plaintiffs failed to exhaust their Tribal Court remedies and that the Tribal Court should, in the first instance, determine its own jurisdiction. LUPC filed two separate motions, one on behalf of the LUPC and the individual LUPC defendants, and the second on behalf of the individual Business Council defendants. The second motion adopts the arguments of the first motion.

      The plaintiffs filed a motion for injunctive relief in this Court to enjoin the defendants from attempting to enforce Tribal ordinances against them. This motion contains many of the same challenges to Tribal Court jurisdiction that were made in the plaintiffs' response to LUPC's motions to dismiss. The Court will turn first to the motions to dismiss.

## ANALYSIS

### Exhaustion

      The Supreme Court has mandated the exhaustion of tribal remedies as a prerequisite to a federal court's exercise of its jurisdiction: "[E]xhaustion is required before such a claim may be entertained by a federal court." *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 851-53 (1985). This is true even for non-Indian defendants sued in Tribal Court who allege that the proceedings exceed Tribal

**Memorandum Decision & Order - 3**

sovereign jurisdiction. *Burlington Northern R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1244 (9th Cir. 1991). In *National Farmers Union,* the Supreme Court recognized that Tribal Courts are capable of resolving difficult jurisdictional issues. 471 U.S. at 856–57. That decision teaches that Tribal Courts (1) should be afforded a "full opportunity" to determine their own jurisdiction, (2) are capable of "rectifying errors," (3) will create a more complete record for eventual federal court review, and (4) will provide federal courts with the benefit of tribal court "expertise." *Id.* This is particularly true when litigation concerns the validity of a tribal ordinance – the "tribe must itself first interpret its own ordinance and define its own jurisdiction." *Burlington Northern*, 940 F.2d at 1246. "The requirement of exhaustion of tribal remedies is not discretionary; it is mandatory." *Id*. at 1245.

However, the Supreme Court has recognized four exceptions to the exhaustion requirement:

> (1) when an assertion of tribal court jurisdiction is "motivated by a desire to harass or is conducted in bad faith"; (2) when the tribal court action is "patently violative of express jurisdictional prohibitions"; (3) when "exhaustion would be futile because of the lack of an adequate opportunity to challenge the [tribal] court's jurisdiction"; and (4) when it is "plain" that tribal court jurisdiction is lacking, so that the exhaustion requirement "would serve no purpose other than delay.

*Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 847 (9th Cir. 2009) (quoting *Nevada v. Hicks*, 533 U.S. 353, 369 (2001)).

To determine whether it is "plain" that tribal jurisdiction is lacking, the Court determines whether jurisdiction is "colorable" or "plausible." *Id.* at 848. "If jurisdiction

**Memorandum Decision & Order - 4**

is 'colorable' or 'plausible,' then the exception does not apply and exhaustion of tribal court remedies is required." *Id.*

**Is Tribal Court Jurisdiction Plausible?**

Plaintiffs argue that the fourth exception applies because it is plain that the Tribal Court lacks jurisdiction. If jurisdiction is plausible, exhaustion is required. Resolving this issue requires reviewing the scope of Tribal Court jurisdiction.

Once Tribal land is converted into fee simple, the Tribe loses plenary jurisdiction over it. *Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 328 (2008). When the fee simple title is conveyed to a non-Indian, the Tribe loses "regulatory jurisdiction over the use of the land by others." *Id*. at 329. As a general rule, then, the Tribe has "no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land." *Id.*

There are two exceptions to this general rule. Tribes may regulate non-Indians on fee lands when (1) the non-Indians consent, or (2) when their "conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana v. United States*, 450 U.S. 544 (1981). There is no claim of consent here; thus, the only issue is whether there is a plausible case that the second exception applies.

The second exception is to be applied in a "limited" manner, and the burden of establishing it falls on the Tribe. *Plains Commerce*, 554 U.S. at 330. "[T]he tribe may quite legitimately seek to protect its members from noxious uses that threaten tribal

**Memorandum Decision & Order - 5**

welfare or security, or from nonmember conduct on the land that does the same." *Id*. at 336.  However, the conduct of the non-Indians "must do more than injure the tribe, it must 'imperil the subsistence' of the tribal community." *Id.* at 341.  To apply this exception "the tribal power must be necessary to avert catastrophic consequences." *Id.* (quoting F. Cohen, *Handbook of Federal Indian Law* § 4.02[3][c], at 232, n. 220).

One commentator has wondered "how anyone could conceivably fulfill" the catastrophic consequences requirement, and concluded that "it is extremely likely that not a single case in the history of the post-*Montana* jurisprudence would have risen to the level of 'catastrophic consequences' such that it would have granted tribal jurisdiction." Ennis, *Implicit Divestiture and the Supreme Court's Reconstruction of the Indian Canons*, 35 Vt.L.Rev. 623, 648 (2011); *see also* Sweeney, *The Bank Began Treating Them Badly: Plains Commerce, The Supreme Court, and the Future of Tribal Sovereignty*, 33 Am.Indian L.Rev. 549, 573 (2009) (describing the *Plains Commerce* standard as an "absurdly high standard [that] essentially vitiat[es] the possibility of its use").

Importantly, however, the *Plains Commerce* decision was not about zoning – it was about land sales.  *Plains Commerce* made it very clear that "conduct taking place on the land and the sale of the land are two very different things." *Plains Commerce*, 554 U.S. at 340.  In summarizing the holdings of past cases that did discuss the Tribe's power to regulate *conduct* on the land as opposed to the *sale* of land, *Plains Commerce* did not use the strict "catastrophic" language, but recognized a different test:  "Put another way, certain forms of nonmember behavior, even on non-Indian fee land, may sufficiently

**Memorandum Decision & Order - 6**

affect the tribe as to justify tribal oversight. While tribes generally have no interest in regulating the conduct of nonmembers, then, they may regulate nonmember behavior that implicates tribal governance and internal relations." *Id*. at 335.

The past case that did involve zoning – and which was left intact by *Plains Commerce* – was *Brendale v. Confederated Tribes and Bands of Yakima Nation*, 492 U.S. 408 (1989).  Unfortunately, it is a fractured decision.  A six-Justice majority held that *Montana's* second exception did not authorize the Yakima Nation to impose zoning regulations on non-Indian fee land located in an "open" area of the reservation where 80% of the population were not members of the Tribe, and nearly 50% of the acreage was owned by nonmembers. *Id.* at 430–431(opinion of White, J.); *id*., at 444–447 (opinion of Stevens, J.).  But in another area of the Reservation – which was closed to the general public and where just 3% of the acreage was held in fee – five Justices concluded that *Montana's* second exception did permit the Tribe to impose zoning restrictions on nonmember fee land, although these five Justices could not agree on a rationale.  *Id.* at 440 (opinion of Stevens, J.); *id*. at 457-459 (opinion of Blackmun, J.).

Justice Blackmun, joined by two other Justices, employed a broad rationale, explaining that the Tribes' power to control land use "is especially vital to Indians, who enjoy a unique historical and cultural connection to the land." *Id.*  at 458.  Justice Stevens on the other hand, writing for one other Justice, used a narrower rationale, explaining that the Tribes lose the right to zone those areas of the Reservation where nonmembers make up more than half of the landowners and 80% of the resident population.

**Memorandum Decision & Order - 7**

So what is the standard? When do Tribes have jurisdiction to apply their zoning regulations to non-members on fee lands within the Reservation? Must the Tribes show "catastrophic consequences" if zoning is banned? Need the Tribes demonstrate that the nonmember's use of the fee land could include "noxious uses that threaten tribal welfare"? Must the Tribe also show that the area sought to be zoned is a "closed" area where Tribal members make up the bulk of the resident population and fee lands make up a very small percentage of the total acreage?

While the precise contours of the Supreme Court's holdings are fuzzy, two factors appear to play a central role in determining whether the Tribes have jurisdiction to apply their zoning regulations to nonmembers on fee lands: (1) the potential dangers addressed by the zoning; and (2) the character of the Reservation surrounding the land sought to be controlled by the Tribes' zoning.

With regard to the first factor, LUPC's affidavits describe a number of potential dangers from the Evans' residence, the principal one being groundwater contamination. Wells in the area of the home – and in an area spreading out to 63 square miles – have been found by the EPA to be contaminated with ethylene dibromide (EDB), a cancer-causing agent. *See Second Declaration of Galloway, Sr (Dkt. No. 46)* at ¶ 7. Tony Galloway, the Chairman of the LUPC, states that

> [i]f the wells are not dug to the proper depth, sealed correctly, constructed with appropriate materials, etc., the Tribes' and all Reservation residents' interests in health and welfare are imperiled. Because David Evans has prevented the Tribes from inspecting his building plans or the construction site, the Tribes cannot determine the extent of danger or risk or harm to Tribal interests.

**Memorandum Decision & Order - 8**

*Id.* at ¶ 8.  Another danger identified by Galloway is septic systems.  He states

> David Evans' application for a septic system to the Southeast Idaho District Health Department failed to disclose the existence of the first septic system for a trailer on his property.  David Evans has an unpermitted septic system connected to the trailer on the same property.  The size of David Evans' property and the soil type are incompatible with the need for two drain fields or two septic tanks.

*Id*. at ¶ 14.

The Tribes also raise concerns about the dumping of construction waste and the heightened risks of wildfires.  The Ninth Circuit has held that plausible threats of water contamination and wildfire are sufficient to trigger the exhaustion requirement.  *Rincon Mushroom Corp. v. Mazzetti*, 2012 WL 2928605 (9th Cir. 2012).[1]

The plaintiffs counter with proof that these alleged threats are not plausible.  Evans specifically counters Galloway's accusation that he is using an unpermitted septic system connected to a trailer:  "When construction of my house was completed, the trailer that had been on the property was removed and that septic tank is not being used."  *See Evans' Affidavit (Dkt. No. 61)* at ¶ 2.  The plaintiffs' rebuttal brief contends that "Evans did not drill any new well for his house," *see Rebuttal Brief (Dkt. No. 59)* at 3, and cites his affidavit, although that assertion is not contained in the affidavit.  The affidavit does say, however, that "[m]y potable water is provided by connection to a community water system in the area.  The system is regulated by the EPA to drinking water standards."  *Id*.

---

[1] This decision is unpublished.  Under Ninth Circuit Rule 36-3 and Fed.R.App.P. 32.1, the decision is not binding on the Court but may be cited to provide guidance.

**Memorandum Decision & Order - 9**

at ¶ 5.

However, the EPA report cited by plaintiffs shows that it found unacceptable levels of EDB in wells in the area of Evans' home. *See Report* at Figure A-1. The EPA estimates a plume of groundwater EDB contamination, the southern edge of which appears to pass under Evans' property, or at least very close to it. *Id*.

To trigger the exhaustion requirement, the Tribes do not have to prove here that the conduct of plaintiffs caused groundwater contamination; they need only show that it would be plausible. And given the EPA's findings of well contamination in that area, the Tribes have at least made out a plausible case. Moreover, the threat of wildfires is another plausible threat that must be considered.

Thus, with regard to the first factor listed above for determining Tribal jurisdiction – the dangers addresses by zoning – it is at least plausible that LUPC could satisfy this factor. With regard to the second factor – the character of the surrounding land – the plaintiffs submitted a map of the section (section 2 consisting of 640 acres) where Evans' property was located, showing that the entire section was owned in fee by various owners, and that all the owners appeared to be nonmembers. *See Glascock Affidavit*, *(Dkt. No. 29)*.[2] Likewise, the sections to the South are owned by the City of Pocatello and used for an airport. *Id*. However, the sections immediately to the North are comprised entirely of

---

[2] Glascock is the Power County Assessor, and the section that he mapped lies in Power County. Glascock represents that (1) all the land in that section is owned in fee simple, (2) Power County does not tax land owned within the Reservation by Tribal members, and (3) none of the owners listed on the map have applied for the tax exemption to which Tribal members are entitled. From that, it can be inferred that none of the landowners listed on the map are Tribal members.

**Memorandum Decision & Order - 10**

either Tribal land or land owned by Tribal members, and that is also true for the section immediately to the West.  *See Galloway Declaration (Dkt. No. 46)*.  If the entire Reservation is considered, only 2% of the land is owned by nonmembers in fee, similar to the 3% figure in *Brendale* for the area where zoning was approved.

The scope of the evaluation will largely determine the answer to this issue.  If the Court focuses only on section 2, the character of the land looks much different than if the Court focuses more broadly on either the surrounding sections or the Reservation as a whole.[3]

It is not clear from the case law how broadly the Court should look in determining the character of the land under *Brendale*.  The plaintiffs cite no case that evaluates only a single section.  *Brendale* itself looked quite broadly, dividing the Reservation into just two parts.  Thus, it is plausible that the evaluation here would extend beyond section 2 and sweep in lands that are largely Tribal lands or owned by Tribal members.  Such a broad evaluation makes it at least plausible that *Brendale* will confirm the Tribe's jurisdiction in this case.

Determining the "scope of tribal court jurisdiction is not an easy task." *Elliott*, 566 F.3d at 849.  Evaluating both the character of the surrounding lands, and the potential

---

[3] The Court recognizes that in 2001, an Idaho Magistrate Judge focused on this very area and found that because it was largely owned by nonmembers, the land fell into the "open" character described in *Brendale*, precluding the Tribes from imposing zoning restrictions on that area.  *See Counsel's Affidavit (Dkt. No. 26)*.  While that decision was upheld on appeal to the Idaho District Court, the court used different reasoning, holding that the Tribes failed to show any conduct threatening Tribal welfare. *Id.*  These decisions do not agree on an analysis, are not binding on this Court, and do not address the plausibility standard at issue here.  Hence the Court will not follow either of them.

**Memorandum Decision & Order - 11**

dangers if no zoning is permitted, the Court finds that under *Montana's* second exception, it is at least plausible – a very low standard – that the construction of the residence may imperil the Tribes' welfare. Accordingly, the fourth of *Elliott's* exceptions to exhaustion – that the Tribal Court plainly does not have jurisdiction – does not apply here. The Court expresses no opinion on whether LUPC's submissions are true and accurate. The Court is not making any definitive finding on Tribal Court jurisdiction at this time, but only determining that jurisdiction is plausible.

**Bad Faith Harassment**

Plaintiffs argue that defendant George Guardipee visited the work site on one occasion and yelled at the work crew, ordering them to stop and threatening to have the U.S. Marshal put them in a federal penitentiary. *See Pickens Affidavit (Dkt. No. 30)* at ¶ 4. Plaintiffs allege that the work stoppage caused by Guardipee caused 17 days of lost work and $17,000 in damages. They also cite the Tribes threats of fines and sanctions as further harassment.

The plaintiffs must show that the Tribal Court action is "motivated by a desire to harass or is conducted in bad faith." *Elliott,* 566 F.3d at 847. Assuming the truth of plaintiffs' allegations, they largely concern the outrageous actions of one man on a single day. Some Courts have held that the bad faith must emanate from the Tribal Court itself in order for this exception to apply. *See e.g. Grand Canyon Skywalk Development LLC v SA' NYU WA* 2012 WL 1207149 (D.Ariz. 2012). This Court need not rely on that precedent because even looking beyond the Tribal Court to the Tribes' conduct, it does

**Memorandum Decision & Order - 12**

not appear – on the admittedly thin record of this just-filed case – that the Tribes are targeting the plaintiffs as part of some bad faith personal vendetta. Instead, it appears that the Tribes are asserting an authority to zone that could be applied across the Reservation. Given the Court's finding that it is at least plausible that the Tribal Court may have jurisdiction, the Court cannot find as a matter of law that the Tribal Court action was filed in bad faith.

## Conclusion

There is no serious argument that the other two exceptions listed in *Elliott* above apply to this case. Accordingly, the plaintiffs must exhaust their Tribal Court remedies, and the Court will grant LUPC's motions to dismiss, without prejudice to plaintiffs' rights to re-file this case once they exhaust their Tribal remedies. The Court refuses to stay this case; its docket should reflect active cases proceeding to a resolution, not cases being litigated in other forums. However, if this case is re-filed, the Clerk's Office will be directed to reassign the case to the undersigned judge, because of my familiarity with the case.

It follows from these findings that the plaintiffs' motion for preliminary injunction must be denied.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motions to dismiss (docket nos. 20 & 23) are GRANTED, and this action is hereby DISMISSED without

**Memorandum Decision & Order - 13**

prejudice to the rights of plaintiffs to re-file this action after exhaustion of Tribal Court remedies.

IT IS FURTHER ORDERED, that the motion for preliminary injunction (docket no. 25) is DENIED.

IT IS FURTHER ORDERED, that the Clerk shall dismiss this case.

IT IS FURTHER ORDERED, that if this case is re-filed, the Clerk's Office is directed to reassign the case to the undersigned judge.

DATED: **December 20, 2012**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order - 14**